UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Patrick Lloyd Henry

          Defendant.

Case No. 0:19-cr-303-SRN-KMM

**REPORT AND RECOMMENDATION**

      This matter is before the Court on Patrick Lloyd Henry's Motion to Suppress Evidence (ECF No. 23) and Motion to Suppress (ECF No. 22). After careful consideration, the Court recommends that both motions be DENIED.

## I.  Factual Background

      Mr. Henry challenges the legality of actions taken by law enforcement on two separate occasions. First, Mr. Henry seeks suppression of evidence discovered during the course of a March 2019 traffic stop. Second, he seeks to suppress statements made during an interrogation conducted in November 2019.

### A.  March 12, 2019 Traffic Stop

      At approximately 3:15 a.m. on Tuesday March 12, 2019, Rochester Police Department Officer Jake Matz observed a beige or gold Cutlass Sierra turn right from the east side of 2nd Street in Rochester, Minnesota, and begin to travel northbound in front of him on 11th Avenue NE. (Tr. 23.) When the Sierra turned onto 11th Avenue NE, it was approximately two blocks ahead of Officer Matz. (*Id.* at 23.) Officer Matz observed the car travel only one block before taking an immediate right turn (back towards the east) onto 3rd Street. (*Id.*) Officer Matz found this behavior suspicious. Specifically, he described the neighborhood as primarily residential and "very quiet" during the night. (*Id.* at 25.) He saw no other traffic and believed that it

was unusual to see vehicles travelling in that area at that time of the morning. (*Id.*) Based on this information, Officer Matz decided to follow the Sierra. (*Id.* at 26–27.)

As Officer Matz turned, he saw the car already turning left from 3rd Street onto 14th Avenue NE, at an intersection three blocks away from his location at 3rd Street and 11th Avenue NE. (*Id.* at 27.) Because the car was so far away from him at that point, Officer Matz believed the driver of the Sierra was speeding and suspected it was an attempt to evade police contact. (*Id.* at 28.) Officer Matz sped up and followed the path he believed the Sierra had taken. However, when he reached the intersection where he had seen the car turn, it was no longer in sight. (*Id.* at 29.) Officer Matz traveled back to 11th Avenue NE and began traveling northbound, where he found the Sierra several blocks ahead of him. (*Id.*) The car then turned right (eastbound) off of 11th Avenue NE onto 7th Street. (*Id.*) Officer Matz followed and sped to catch up. When he was about a block and a half behind the car, it made the next available turn, left (northbound) onto 13th Avenue NE. (*Id.* at 36.) As Officer Matz followed, the Sierra pulled over to the right side of the curb to park. (*Id.*)

Based on the driving behavior, the time of night, and the strange route they took to their destination, Officer Matz was "highly suspicious" that the occupants of the vehicle were attempting to evade police conduct. As he caught up to the now-parked Sierra, Officer Matz activated the lights and sirens on his vehicle. Before he stopped the squad car, the driver of the Sierra attempted to open his door. (Tr. at 38–39.) Officer Matz ordered the driver to stay in the vehicle, and then approached the passenger side of the Sierra. (*Id.* at 40.) Inside was the driver, Mr. Kochen, and a passenger, Mr. Henry. Mr. Kochen admitted that he did not have a valid driver's license or any insurance for the car because it was recently purchased. (*Id.*) When Officer Matz asked if Mr. Kochen lived in the area, he refused to answer. (*Id.*)

Officer Matz made several observations during the traffic stop that furthered his suspicion that criminal activity was afoot. While speaking with Mr. Kochen through the passenger's side door, Officer Matz observed glue sticks inside the car. He believed that the glue sticks could be an indication of drug activity, because he had seen glue sticks in pipe kits for smoking methamphetamine and marijuana. (*Id.* at 53.) Officer Matz also saw both Mr. Kochen and Mr. Henry smoking cigarettes, which he

2

believed could be an attempt to mask the smell of marijuana, calm nerves, or to have "one last" cigarette because the car's occupants knew they were going to jail. (*Id.* at 50.) Shortly after approaching the Sierra and making contact with Mr. Kochen, Officer Matz moved to the driver's side of the vehicle, where he made several additional observations. He noticed that the car was in very poor condition: the dash was torn apart, the steering column ripped out, the center console torn off, and the ignition "not present." (*Id.* at 44.) Officer Matz saw a number of "spare, random items" in the backseat of the car, and on the floorboard of the driver's seat area, he noticed a small rectangular box that he believed to be a digital scale. (*Id.* at 44–45.) These observations, in concert with his previous observations, led Officer Matz to believe that Mr. Kochen and Mr. Henry were involved in some narcotics-related activity. (*Id.* at 45.)

Officer Matz then left Mr. Kochen and Mr. Henry in the car to check Mr. Kochen's driving record while Officers Loken and David Dezell maintained the scene. After confirming multiple prior convictions for driving without insurance and that he had no insurance presently, Officer Matz decided to arrest Mr. Kochen. (*Id.* at 48.) During a search incident to the arrest, Officer Matz discovered a jar containing approximately 5 grams of marijuana. (*Id.* at 51.) He then decided to search the car for evidence of narcotics. (*Id.*) While Officer Matz arrested Mr. Kochen, Mr. Henry asked Officer Dezell, who was standing by his window, several times if he was under arrest and if he could call for a ride. (Govt. Ex. 4 at 1:51–1:55, 2:30–2:32, 3:45–3:55, 5:30–5:35.) Approximately six minutes after Officer Matz informed Mr. Kochen he was under arrest, Officer Dezell asked Mr. Henry to leave the Sierra. (*Id.* at 7:41.) During that intervening time, Mr. Kochen was asked to leave the vehicle, handcuffed, taken to Officer Matz's squad car, searched incident to arrest, and secured in the back seat of the squad. (*Id.* at 1:51–7:41, *see also* Govt. Ex. 3 at (17:42–23:53).)

Before leaving the car, Mr. Henry took off his coat, pulled a sweatshirt from the coat, and then left the car. (*Id.* at 54) Given that the outside temperature was approximately 17 degrees Fahrenheit, Officer Dezell checked that Mr. Henry did not want his coat, which he confirmed he did not. (*Id.* at 54–55.) Mr. Henry was informed that he was not under arrest, but was pat-searched for officer safety. (Govt. Ex. 4 at 8:00–8:20.)

3

The officers began their search of the car, with Mr. Henry still standing outside. Officer Matz confirmed his suspicion that the item on the floor of the driver's side was a digital scale. Then, because of the cold temperature, Officer Matz directed Mr. Henry to sit inside a police squad. (Govt. Ex. 3 at 25:00.) Shortly thereafter, Officer Loken picked up the winter coat Mr. Henry had left in the Sierra. He discovered a loaded firearm and a loaded magazine inside the coat. (Tr. at 56.) Officer Matz checked Mr. Henry's criminal history, and after discovering that he had a felony record, Officer Matz placed him under arrest. (*Id.* at 57.)

The search of the Sierra revealed additional contraband. Under a sweatshirt that was located under Mr. Henry's winter coat, officers found seven bags of methamphetamine, each weighing between 23 and 28 grams. (*Id.* at 58–59.) Law enforcement also found additional empty baggies and digital scales in the car. (*Id.*)

### B.     November 8, 2019 Interrogation

On November 7, 2019, a federal complaint was filed against Mr. Henry regarding the March 2019 events, and a warrant for his arrest was issued. At that time, Mr. Henry was in custody in Rochester, Minnesota on state charges, including being a felon in possession of a firearm, arising from the same events. (Tr. 96–97.) On November 8, 2019, Investigator Kelly McMillin transported Mr. Henry from the Olmsted County Jail in Rochester, Minnesota to Saint Paul. (Tr. at 96–97.) At the outset of the trip, after placing Mr. Henry in the backseat of his squad car, Investigator McMillin read Mr. Henry his *Miranda* rights. (*Id.* at 98.) He then told Mr. Henry that they could talk during the drive if Mr. Henry wished to. (Govt. Ex. 5 at 5:13.) Mr. Henry indicated that he understood his rights and continued to speak with Investigator McMillin. After being asked by Mr. Henry what the charges were, he told Mr. Henry that he had been charged as an Armed Career Criminal. (*Id.* at 5:43.) Mr. Henry did not seem to understand what these charges entailed:

| | |
|---|---|
| Mr. Henry: | What's that? |
| Investigator McMillin: | It means you have an extensive criminal history and involvement with firearms. |
| Mr. Henry: | What the hell does that mean? |

4

| Investigator McMillin: | What does that mean? |
|---|---|
| Mr. Henry: | They're trying to charge me with Armed Career Criminal? |
| Investigator McMillin: | Yeah, they're—that's what the prosecutor's charged you with, correct. |

(*Id.* at 5:43–:45.)  Investigator McMillin then asked Mr. Henry a series of questions relating to other criminal activity.  Mr. Henry and Investigator McMillin conversed for the majority of the trip from Rochester to Saint Paul.  (Tr. at 101.)

## II.   Analysis

Mr. Henry now seeks to suppress the evidence obtained as a result of the March 2019 traffic stop, as well as the statements made during the November 8, 2019 car ride from Rochester to Saint Paul.  For the following reasons, the Court recommends that Mr. Henry's motions be denied.

### A.   The Initial Traffic Stop

The initial stop of the Sierra implicates two different aspects of Fourth Amendment analysis.  First, any traffic violation, no matter how minor, creates probable cause to stop a vehicle.  *E.g.*, *United States v. Ramos-Caraballo*, 373 F.3d 797, 801 (8th Cir. 2004).  If an officer has probable cause that a traffic violation occurred, a traffic stop does not violate the Fourth Amendment.  *See United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (noting that a police officer is "justified in making the stop if he objectively had a reasonable basis for believing that the driver has breached a traffic law." (internal quotation marks omitted)).

Second, an investigative traffic stop can be examined through the lens of *Terry v. Ohio*, 392 U.S. 1 (1968).  "It is well-settled under *Terry* that an investigatory stop is permissible under the Fourth Amendment if supported by reasonable suspicion that the person stopped is involved in criminal activity."  *United States v. Arnold*, 835 F.3d 833, 838 (8th Cir. 2016) (citing *Terry v. Ohio*, 392 U.S. at 30 (1968)).  A *Terry* stop is valid if an officer can point to "specific and articulable facts" and rational inferences

drawn from those facts to support his reasonable suspicion. *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (citing *Terry*, 392 U.S. at 21.) The Court must look at the totality of the circumstances to determine whether a *Terry* stop was justified. *Id.*

Mr. Henry argues that the stop of the Sierra was neither supported by reasonable articulable suspicion nor probable cause. The Court disagrees on both fronts. First, the stop was justified because Officer Matz had probable cause to believe that the Sierra was speeding. The officer's testimony, combined with the video of the final portion of the pursuit and a study of the map provided in Government Exhibit Number 1, demonstrate probable cause that the Sierra was speeding.

Officer Matz credibly testified that he believed the Sierra was speeding based on the distance it covered in a short period of time. (Tr. at 29.) Indeed, he had to travel over the speed limit himself during the pursuit of the Sierra to keep up with it, and still remained far behind until the end. (*Id.*) Video of the incident corroborates Officer Matz's testimony. Government Exhibit 2 shows the final portion of Officer Matz's pursuit of the Sierra, as it turned from 11th Avenue NE onto 7th Street NE and then to its stopping point on 13th Avenue NE. The video shows the Sierra actively pulling away from Officer Matz on 7th Street NE (Govt. Ex. 2 at 0:10) before slowing to turn onto 13th Avenue. Though there is no video of the Sierra after it rounds the corner, the sound of rapid acceleration can be heard on the audio after the Sierra makes the turn onto 13th Avenue. (Govt. Ex. 2 at 0:19.) The squad catches up with the Sierra just in time to witness it pull to the side of the road to park—the Sierra does not signal to pull over. Based on this record, the police had probable cause to believe the Sierra was speeding, and were therefore legally justified in conducting a traffic stop.

Even aside from the speeding offense, the evasive driving behavior Officer Matz witnessed, the apparent speeding in response to encountering law enforcement, and the location and time of night combine to establish reasonable articulable suspicion to pull the vehicle over. The Court finds Officer Matz's testimony regarding the evasive driving to be credible. Its own review of the map of Rochester streets where the pursuit took place demonstrates a strange and circuitous route towards the car's eventual destination. Though Mr. Henry offers an innocent

6

explanation for the driving—that the car could have been lost and looking for an address—that does not obviate the principle that "police are entitled to be suspicious of vehicular movement that, while not illegal, may be reasonably perceived as evasive." *United States v. Juvenile TK*, 134 F.3d 899, 903 (8th Cir. 1998). When considering the facts that led to the traffic stop collectively, it is clear that Officer Matz was legally permitted to stop the Sierra.

### B.      Extension of Stop and Seizure of Mr. Henry

Mr. Henry argues that, even if the initial stop was lawful, the officers' decision to extend the stop as to him rather than allow him to leave constitutes a separate Fourth Amendment violation. Again, the Court disagrees. The relatively brief period of time between the initial stop and the discovery of the firearm and methamphetamine did not exceed that justified by the evolving circumstances known to the officers at the scene.

After lawfully stopping a vehicle, an officer is entitled to investigate the suspected traffic violation as well as make "ordinary inquiries incident to the traffic stop," including checking the driver's license, the vehicle's registration and insurance status, and determining whether the driver has any outstanding warrants. *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). A seizure justified only by the interest in investigating a traffic violation may become unlawful if it prolonged beyond the time that is reasonably necessary to do so. *See Caballes*, 543 U.S. at 407. However, if in the course of investigating a traffic stop, law enforcement develops a reasonable articulable suspicion of additional criminal activity, the traffic stop seizure may be lawfully extended. *United States v. Murillo-Salgado*, 854 F.3d 407, 415 (8th Cir. 2017). The totality of the circumstances must be considered when determining if reasonable suspicion existed and if the duration of the investigative stop was too long. *Id.*

Here, early in the encounter with the Sierra, Officer Matz noticed what he believed to be a digital scale on the driver's side floorboard. Combined with the evasive driving and the time of night, this gave him reasonable suspicion to believe that criminal activity was afoot, thus entitling him to extend the stop somewhat to

7

further investigate for potential narcotics activity.[1] Even more critically, very early in the course of investigating Mr. Kochen's alleged traffic violation of speeding, Officer Matz discovered that Mr. Kochen did not have a valid license and was driving without insurance. Officer Matz therefore promptly arrested Mr. Kochen and during a search incident to the arrest, discovered marijuana on his person. This discovery, particularly when combined with the evasive driving and the digital scale, created probable cause to search the Sierra. *See United States v. Davis*, 569 F.3d 813, 817–18 (8th Cir. 2009) (finding that a discovery of drugs on the driver's person constitutes probable cause to search the vehicle).

It is true that Mr. Henry was not free to leave during this time. But a passenger may be lawfully detained along with the driver during an investigative vehicle *Terry* stop. *See Brendlin v. California*, 551 U.S. 249, 257–58 (2007); *Waters v. Madson*, 921 F.3d 725, 739 (8th Cir. 2019). Mr. Henry argues that the mission of the traffic stop was completed at the moment that Mr. Kochen was informed that he was under arrest, and therefore Mr. Henry should have been immediately released. The Court disagrees. Mr. Henry's brief detention while Mr. Kochen was removed from the car, handcuffed, and searched was not a violation of his Fourth Amendment rights.

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address that traffic violation and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015).

---

[1] The Court does not credit the inferences Officer Matz drew from the presence of cigarettes or glue sticks. Officer Matz testified that smoking cigarettes during a traffic stop was an indicator of drug or other illegal activity, because the cigarettes could hide the smell of marijuana, calm the nerves, or be an indicator that the smoker knows they are going to jail. (Tr. at 50.) However, cigarette use has an equally plausible innocent explanation—that the individual smoking regularly smokes cigarettes, or that the stress of a traffic stop might lead any smoker to desire to smoke. Cigarette use cannot be used to support a reasonable articulable suspicion that criminal activity is occurring. Similarly, the Court does not find that the presence of glue sticks in the car indicated drug use. Officer Matz failed to explain the correlation between glue sticks and drug use, and the Court is unaware of such a concern. This is not a case where paraphernalia with a clear drug correlation, such as pipes or rolling papers, was present. Thus, without more information, the Court is unable to credit Officer Matz's inference of drug activity from the presence of glue sticks.

"Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009). Here, the decision to arrest Mr. Kochen did not complete the stop because issues of safety required that the police continue to control the scene while Mr. Kochen was being arrested.[2]

In an analogous situation, the Eighth Circuit has held that a passenger may be ordered to reenter a vehicle and stay there without a basis to infer that he was involved in criminal activity:

> While the Supreme Court has not addressed this particular issue, it has decided the closely analogous question of whether a police officer may order a passenger in a vehicle to *exit* the vehicle during a lawful traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). Applying Fourth Amendment jurisprudence, the Court balanced the "public interest" in police officer safety with the right of the passengers to be "free from arbitrary interference by law officers." The Court cited statistics of assaults and killings of police officers during traffic pursuits and stops, and it noted that when there is more than one occupant in a vehicle, "the possible sources of harm to the officer" are increased. *Id.* On the personal liberty side of the balance, the Court considered that passengers might have a stronger liberty interest than drivers but noted, "[A]s a practical matter, the passengers are already stopped by virtue of the stop of the vehicle."

*United States v. Sanders*, 510 F.3d 788, 789–90 (8th Cir. 2007) (quotation and citations omitted). This logic extends to ordering a passenger to remain in the car while

---

[2] Mr. Henry highlights Officer Matz's testimony that he would have let Mr. Henry go when he first approached the car to suggest that there were no safety concerns. (*See* Tr. at 81–82.) However, there is no testimony regarding what Officer Matz might have done to ensure his safety had Mr. Henry asked to be let go and Officer Matz had agreed—he "surely was not constitutionally required to give [Mr. Henry] an opportunity to depart the scene after he exited the vehicle without first ensuring that, in doing so, [he] was not permitting a dangerous person to get behind [him.]" *Johnson*, 555 U.S. at 334. Further, the scene quickly evolved from the moment Officer Matz first approached the car to when Mr. Henry actually requested to leave, after Officer Matz had noticed the digital scale, and after Mr. Kochen was being arrested.

9

officers safely arrest the driver, without permitting a potentially dangerous passenger to interrupt the process. *C.f. Johnson*, 555 U.S. at 334.

Once the officers discovered the marijuana in Mr. Kochen's pocket, they then had probable cause to search the vehicle. *See Davis*, 569 F.3d at 817–18 (8th Cir. 2009) (finding that a discovery of drugs on the driver's person constitutes probable cause to search the vehicle); *see also Murillo-Salgado*, 854 F.3d at 418 ("Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place.") (quotation and citation omitted). And it is well-established that the officers were constitutionally permitted to remove Mr. Henry from the vehicle at that point. *E.g.*, *Wilson*, 519 U.S. at 410. Finally, given the presence of the scale in plain sight, the marijuana on Mr. Kochen's person, and the evasive driving through a residential neighborhood in the middle of the night, the police had reasonable suspicion that Mr. Henry was involved in drug activity along with Mr. Kochen to justify continuing his seizure during that search of the car.

In sum, the Court finds that the passage of time between the initial stop of the Sierra and the search of the vehicle was not so long as to exceed the legal justification for the stop.

### C. Search of Mr. Henry's Jacket

Mr. Henry's motion to suppress the firearm and other evidence seized at the March 2019 traffic stop is premised on the argument that his seizure was unlawful, and thus the gun and drugs are fruit of the poisonous tree. He does not independently challenge the search of the vehicle or his coat where the weapon was found.

Having already found that the stop and eventual search of the car were lawful, the search of the jacket was permissible. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). This includes a passenger's personal belongings. *Murillo-Salgado*, 854 F.3d at 418 (citing *Wyoming v. Houghton*, 526 U.S. 295, 302 (1999)). Therefore, it was

permissible for officers to search Mr. Henry's jacket. Indeed, even had Mr. Henry been permitted to leave the scene, officers would have been allowed to search the jacket he left behind and would have discovered the gun and drugs it concealed. Their suppression is not required.

### D. Motion to Suppress Statements

Mr. Henry next challenges the validity of the custodial interrogation that occurred on November 8, 2019 during the car ride from Rochester to the Twin Cities. Specifically, he argues that he did not make a valid *Miranda* waiver, and thus the interrogation was a violation of his Sixth Amendment rights. The Court disagrees for several reasons.

"[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). The Sixth Amendment right does not attach until a defendant makes his initial appearance in federal court. *See Rothgery v. Gillespie County, Tex.*, 554 U.S. 191, 199 (2008) (noting that the right to counsel "attaches at the initial appearance before a judicial officer.") At the time of the challenged conversation, no such hearing had occurred—only a complaint had been filed and the arrest warrant issued. Therefore, Mr. Henry had no Sixth Amendment right to counsel with respect to the federal charges contained in the November 7, 2019 criminal complaint.

Mr. Henry asks this Court to revisit settled precedent and find that his Sixth Amendment right to counsel had attached at the time of the interview. Among other things, he implies that his statement was unlawfully taken because his state court right to counsel had already attached. However, the Court finds that even if it had the authority to disrupt precedent and were inclined to do so, such efforts would be futile.

It is true that at the time of the conversation, Mr. Henry was in state custody on charges that were in part identical to the federal charges against him under governing precedent. The Supreme Court held in *Texas v. Cobb*, 532 U.S. 162, 173 (2001), that the appropriate test to determine whether two offenses are distinct is the *Blockburger* test, derived from *Blockburger v. United States*, 284 U.S. 299 (1932). This test

11

asks "whether each provision [of the law allegedly broken] requires proof of a fact which the other does not." *Cobb*, 532 U.S. at 173. Here, Mr. Henry was charged in two jurisdictions with being a felon in possession of a firearm, although the separate sovereign doctrine may mean that the offenses are distinct regardless of sharing elements.[3] *See Gamble v. United States*, 139 S.Ct. 1960 (2019) (recognizing that under the dual-sovereignty doctrine, the Double Jeopardy Clause allows successive prosecutions by separate sovereigns). However, the Court need not explore these issues further here. Regardless of whether the federal charges are considered the same as or different from the state charges for the purposes of *Cobb*, Mr. Henry was able to waive any right to counsel he may have had.

In *Montejo*, the United States Supreme Court held that the Sixth Amendment right to counsel may be waived by a defendant, regardless of whether that person already has an attorney:

> Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled. And when a defendant is read his *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment[.]

556 U.S. at 786 (internal citations omitted). Therefore, even if Mr. Henry's right to counsel could somehow be read to have attached already at the time of his car ride with Officer McMillin, his subsequent admissions are admissible because he waived that right.

Mr. Henry argues that his waiver was not made knowingly because he was confused about the ACCA enhancement he faced. This argument does not carry the

---

[3] The Court disagrees with the government's assertion that the inclusion of Armed Career Criminal Act ("ACCA") enhancement causes the federal "felon in possession" elements to be factually distinct from the state's "felon in possession" charges. *See Almendarez-Torrez v. United States*, 523 U.S. 224, 246–47 (1998).

day. The waiver of the right to counsel during interrogation must be made with a "full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986) (discussing the right in the Fifth Amendment context). However, it is not required that a suspect know and understand all possible consequences of waiving the right to counsel. *Colorado v. Spring*, 479 U.S. 564, 574 (1987); *see also William v. Norris*, 576 F.3d 850, 868 (8th Cir. 2009). Rather, the suspect must know of his right to choose not to speak with law enforcement without counsel present. *See Spring*, 479 U.S. at 574 (holding that a waiver of constitutional rights under the Fifth Amendment is knowing and intelligent when the suspect is fully advised of his constitutional privilege). Indeed, many attorneys share some of Mr. Henry's confusion about the application and consequences of the ACCA. But the complexity of the applicable statutory scheme does not render his decision to waive his rights invalid.

Here, there is no allegation that Mr. Henry failed to understand his right to counsel, or the potential consequences of speaking to law enforcement about criminal activity. Further, Investigator McMillin attempted to explain the charges that Mr. Henry was facing. (*See* Govt. Ex. 3 at 5:43–5:45 ("It means you have an extensive criminal history and involvement with firearms.") Though an imperfect explanation, Investigator McMillin made it clear that the charges involved Mr. Henry's past criminal activity and his use of firearms. The officer did not attempt to misrepresent the scope of the charges or the interrogation. *See Williams*, 576 F.3d at 868. Mr. Henry has not cited any case law to support his argument that a criminal suspect must perfectly understand the charges he faces in order to make a knowing waiver of his Sixth Amendment right to counsel, and the Court has found none. Accordingly, the Court determines that Mr. Henry's waiver was valid.

### III    Recommendation

For the reasons set forth above, the Court concludes that Mr. Henry's challenges seizure of evidence and statements made in this matter must fail. Accordingly, the Court makes the following recommendations:

1. Mr. Henry's Motion to Suppress Statements (ECF No. 22) be DENIED.
2. Mr. Henry's Motion to Suppress Evidence (ECF No. 23) be DENIED

Date: May 20, 2020                              *s/ Katherine Menendez*
                                                Katherine Menendez
                                                United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.